United States District Court
Southern District of New York
——————————————————————————

ROSE VALENTI, ET AL.,

                              Plaintiffs,          10 Civ. 3325 (JGK)

        - against -                                OPINION AND ORDER

THE PENN MUTUAL LIFE INSURANCE CO.,
ET AL.,

                              Defendants.
——————————————————————————

JOHN G. KOELTL, District Judge:

        This case involves an alleged conspiracy by the defendants
to embezzle funds from the plaintiffs' ERISA pension plan (the
"Plan"), in violation of 18 U.S.C. §§ 1964 and 664.   The
plaintiffs are Valenti, Ltd. (the "Company"), a cosmetics and
fragrance concern, Rose Valenti, the president and founder of
the Company and a Trustee of the Plan, Donald Valenti, her
husband and a Plan Trustee, and various individual Plan
participants (collectively, the "plaintiffs").   The defendants
are Penn Mutual Life Insurance Company ("Penn Mutual") and its
agent, Victor Mauro, and the Penn Pension Center ("Penn
Pension"), and its president, Andrew Siegel (collectively, the
"defendants").   Jurisdiction is proper pursuant to 28 U.S.C. §
1332 and 18 U.S.C. § 1964(c).   The defendants have moved for
summary judgment pursuant to Rule 56 of the Federal Rules of
Civil Procedure.   For the reasons explained below, the motion
for summary judgment is **granted**.

                                1

**I.**

The standard for granting summary judgment is well
established. "The court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and that the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett,
477 U.S. 317, 322 (1986); Gallo v. Prudential Residential
Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he
trial court's task at the summary judgment motion stage of the
litigation is carefully limited to discerning whether there are
any genuine issues of material fact to be tried, not to deciding
them. Its duty, in short, is confined at this point to issue-
finding; it does not extend to issue-resolution." Gallo, 22
F.3d at 1224. The moving party bears the initial burden of
informing the district court of the basis for its motion and
identifying the matter that it believes demonstrates the absence
of a genuine issue of material fact. Celotex, 477 U.S. at 323.
The substantive law governing the case will identify those facts
that are material and "[o]nly disputes over facts that might
affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate if it appears that the
nonmoving party cannot prove an element that is essential to the

nonmoving party's case and on which it will bear the burden of proof at trial. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its initial burden of showing a lack of a material issue of fact, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998); Montalbano v. Port Authority of New York and New Jersey, --- F.Supp.2d ----, No. 10 Civ. 5973, 2012 WL 516150, at *1 (S.D.N.Y. Feb. 17, 2012).

II.

The following facts are undisputed unless otherwise noted:

Rose Valenti founded the Company in 1983.  (Second Amended Complaint ("SAC"), at ¶ 10.)  The Plan, a defined-benefit retirement plan covering all Company employees with two or more years of Company service, was established in 1988.  (Def.'s R. 56.1 Stmt. at ¶4; Pl.'s R. 56.1 Stmt. at ¶ 4; see also Siegel Aff. Ex. 1 ("Amended Plan"), at PP 5187, PP 5189.)  Rose Valenti and her husband Donald were the Trustees of the Plan.  (Amended Plan at PP 5188.)  The Plan's initial assets included a whole life insurance policy for Donald Valenti.  (Def.'s R. 56.1 Stmt. at ¶ 9; Pl.'s R. 56.1 Resp. at ¶ 9.)

In 1994, the Valentis hired Penn Pension as a third-party administrator for the Plan.  (See Def.'s R. 56.1 Stmt. at ¶ 6; Pl.'s R. 56.1 Resp. at ¶ 6; see also Siegel Aff. ¶ 4.)  Penn Pension thereafter prepared the Plan's IRS Form 5500 tax returns for each fiscal year, and these prepared forms were provided to Rose Valenti.  (See Siegel Aff. ¶ 4; see also Def.'s R. 56.1 Stmt. at ¶ 7; Pl.'s R. 56.1 Resp. at ¶ 7.)  The contemporaneous Form 5500s and their supporting documents, including actuarial reports for each of the Plan years at issue, are in the discovery record in this case.  (See, e.g., Seigel Aff. ¶¶ 11-58 & Exs. 3-12 (Form 5500s for tax years 1998 through 2008); see

also Seigel Aff. Exs. 23-33 (Actuarial Reports for Plan Years 1998 through 2009).)

Also in 1994, the Plan purchased a Diversifier I Flex group annuity contract (the "Diversifier I") from Penn Mutual. (See Def.'s R. 56.1 Stmt. at ¶ 10; Pl.'s R. 56.1 Resp. at ¶ 10.) Thereafter, other assets were added to the Plan, in particular several other life insurance policies on the lives of the Valentis. (See Seigel Aff. ¶ 5; accord Pl.'s R. 56.1 Resp. at ¶ 15; see also Seigel Aff. Exs. 13-17, 19-22 (insurance policies, forms adding those policies to the Plan, annual statements on the policies).)  The plaintiffs also assert that another annuity, the Diversifier II, which was issued to Rose Valenti in 1999, was an asset of the Plan. (See Pl.'s R. 56.1 Resp. at ¶¶ 10, 15.)  With regard to the Diversifier I, Penn Mutual generated annual statements after the end of each fiscal year for the Diversifier I's performance, and sent these statements to Donald Valenti. (See Locker Aff. ¶ 4; see also Locker Aff. Ex. A (Diversifier I annual statements).)  Penn Mutual retained original, contemporaneous copies of these annual statements and produced them during discovery in this litigation. (See Locker Aff. ¶¶ 3-4.)

The plaintiffs have conceded that the paper records produced in discovery regarding the Plan's accounts and the Diversifier I do not provide any evidence of embezzlement. (See

Oral Arg. Tr. at 20 ("THE COURT: [I]f you accept, just for the present purpose, the paper records of the accounts, they all add up to the penny, including the withdrawals, the deposits, the beginning balances, the ending deposits, right?  MS. ROSELL: Yes, these statements do, yes.").)  However, the plaintiffs argue that the original paper records for the Diversifier I that were produced are not credible, and that Penn Mutual has falsely asserted that it is unable to produce for discovery the underlying original electronic records for the Diversifier I. (See Pl.'s R. 56.1 Resp. at ¶¶ 17, 20.)  More broadly, the plaintiffs assert that values of the Plan that were reported by Penn Pension on the Form 5500 tax forms, and in other paper records, were falsified in order to conceal embezzlement from the Plan.  (See, e.g., Pl.'s R. 56.1 at ¶¶ 46, 94.)

On July 28, 2008, the Valentis each sent letters to Penn Mutual requesting that their portions of the Plan be transferred to their accounts with Washington Mutual ("WAMU").  (See Siegel Aff. Exs. 47-48.)  In a letter recounting the Valentis attempts to close their accounts, Mauro stated that he told WAMU that the Valentis' portions of the Plan could not be transferred to WAMU until the Plan was successfully terminated "because, as owners and sponsors of the Plan, monies must first go to satisfy the vested interest of their employees." (Seigel Aff. Ex. 49 (Letter dated June 15, 2009 of Victor Mauro ("Mauro Letter")),

at 1; <u>see also</u> Siegel Aff. ¶ 59.)   There is no evidence in the
record indicating that the Valentis authorized the termination
of the Plan before September 2008, when the stock market dropped
precipitously.   The evidence in the record shows that the
Diversifier I lost significant value during that period, (<u>see</u>
Locker Aff. Ex. A at PM 00067), however, the plaintiffs assert
that the Plan "did not incur losses as a result of the stock
market crash" but rather "incurred losses as a result of
defendants' embezzlement."  (Pl.'s R. 56.1 Resp. ¶ 97; <u>see also</u>
Pl.'s R. 56.1 Resp. ¶¶ 23-24.)

  Rose Valenti and Andrew Siegel of Penn Pension exchanged
correspondences concerning the termination of the plan beginning
in October, 2008.  (<u>See</u> Siegel Aff. ¶¶ 59-64 & Exs. 50-60.)
Valenti accused Penn Pension of not promptly transferring her
portion of the Plan to WAMU, and asserted that Penn Pension was
responsible for the Plan's lost value.  (Siegel Aff. Ex. 51.)
Siegel replied that Penn Pension was the third-party
administrator of the Plan and had nothing to do with the
investment or processing of the assets of the Plan, and repeated
that funds could not be transferred until the Plan was properly
terminated.  (Siegel Aff. Ex. 52.)  The record indicates that
Penn Pension was still receiving releases from the Plan
participants as late as June, 2009.  (<u>See, e.g.</u>, Siegel Aff. Ex.
56 at PP 3722; <u>see generally</u> Siegel Aff. ¶ 63.)  The Plan made

its final distribution in September, 2009.  (See Siegel Aff. Ex. 59 at PP 3558.)

The plaintiffs assert that the termination discussions actually began in January, 2008, and the discovery record confirms that there was a meeting between Seigel, Mauro, and Rose Valenti in January, 2008.  (See Pl.'s R. 56.1 Resp. ¶ 98; Rosell Decl. Ex. 64.)  More broadly, the plaintiffs assert that the defendants intentionally delayed in terminating the account so that they could take advantage of losses in the stock market to mask their embezzlement from the Plan.  (See, e.g., Pl.'s R. 56.1 Resp. at ¶ 103.)

The plaintiffs filed this lawsuit in April, 2010.  The Second Amended Complaint was filed in August, 2010.  This Court denied the defendants' motion to dismiss the Second Amended Complaint in May, 2011.  Discovery in this case is now closed. The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that there is no evidence of embezzlement in this case.

### III.

### A.

The plaintiffs have asserted a single cause of action in this case.  They allege a conspiracy by the defendants to

violate 18 U.S.C. § 1962(c) through a scheme to embezzle from
the Plan.

To establish a civil RICO claim pursuant to § 1962(c), "a
plaintiff must establish: '(1) that the defendant (2) through
the commission of two or more acts (3) constituting a 'pattern'
(4) of 'racketeering activity' (5) directly or indirectly . . .
participates in (6) an 'enterprise' (7) the activities of which
affect interstate or foreign commerce.'" Weizmann Institute of
Science v. Neschis, 229 F. Supp. 2d 234, 254-55 (S.D.N.Y. 2002)
(quoting Moss v. Morgan Stanley, 719 F.2d 5, 17 (2d Cir. 1983));
see generally 18 U.S.C. § 1962(c).  A plaintiff must also
establish "causation," by establishing that a defendants'
violation of § 1962 caused an injury to the plaintiff.  Id.

To establish a RICO conspiracy claim pursuant to § 1962(d)
a plaintiff must establish "'as to each alleged co-conspirator:
(1) an agreement to join the conspiracy; (2) the acts of each
co-conspirator in furtherance of the conspiracy; (3) that the
co-conspirator knowingly participated in the same.'"  Nasik
Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp.
2d 514, 541 (S.D.N.Y. 2001) (quoting Odyssey Re (London) Ltd. v.
Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 303
(S.D.N.Y. 2000)).  The Court of Appeals for the Second Circuit
has explained that, in a civil RICO conspiracy case, the
plaintiff must establish that each defendant "knew about and

9

agreed to facilitate" a pattern of racketeering activity.
Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir. 2003).

Racketeering activity for the purpose of a civil RICO claim
includes violations of 18 U.S.C. § 664.  See 18 U.S.C. §
1961(1).  Under § 664, it is unlawful for any person to
"embezzle[], steal[], or unlawfully and willfully abstract[] or
convert[] to his own use or to the use of another, any of the
moneys, funds, securities, premiums, credits, property, or other
assets of any employee welfare benefit plan or employee pension
benefit plan, or of any fund connected therewith . . . ."  18
U.S.C. § 664.  Embezzling from an ERISA plan thus constitutes
racketeering, and is a predicate act upon which a civil RICO
claim may be based.  See, e.g., Toms v. Pizzo, 172 F.3d 38, 1998
WL 964199, at *2 (2d Cir. 1998) (table) (citing 18 U.S.C.
§ 1961(1)(B), (C)).

To establish embezzlement, a plaintiff must show that a
defendant embezzled, stole or converted funds from an ERISA
benefit plan for "his own use or to the use of another."  18
U.S.C. § 664.  A plaintiff must also establish that a defendant
"was aware that he was receiving money to which he was not
entitled and knowing that, deliberately appropriated the money
to his own use."  United States v. Snyder, 668 F.2d 686, 690 (2d
Cir. 1982) (internal quotation marks and citations omitted).

Summary judgment dismissing a RICO claim predicated on embezzlement from an ERISA plan should be granted when the evidence in the record shows that no assets where embezzled from the ERISA plan.  See Red Ball Interior Demolition Corp. v. Palmadessa, 908 F. Supp. 1226, 1240-41 (S.D.N.Y. 1995).

**B.**

This is an unusual case.  The plaintiffs have conceded that, based solely on the Plan documents in the summary judgment record, there is no money unaccounted for in the Plan.  (See Oral Arg. Tr. at 20.)  The plaintiffs have also conceded that there is no deposition testimony or affidavit in the record from anyone with personal knowledge asserting that there was any money owed to the plaintiffs that was not received by them. (See Oral Arg. Tr. at 22 ("THE COURT: [B]eyond speculation, where are the people with personal knowledge who say, okay, this is what the Penn Pension and the Penn Mutual people say happened but it didn't happen that way because we contributed money that's not reflected or it indicates that money was withdrawn and we never received it.  There are no such affidavits, right? . . .  MS. ROSELL: There are no such affidavits.").)

The plaintiffs' theory of embezzlement in this case rests upon the assertion that the paper documentation provided by the defendants, which the plaintiffs concede indicates that there

11

was no embezzlement, has been falsified.  The plaintiffs have acknowledged that, because Penn Mutual has produced original paper copies of the Diversifier I annual statements from 1998 through 2009, there must have been deliberate falsification of the records each year for the last decade.  (Oral Arg. Tr. at 21.)  The issue is whether there is any evidence in the record to support this version of events.

### 1.

The plaintiffs assert that the documentary evidence in this case is not credible.  They seek an adverse inference based on the defendants' failure to produce metadata concerning the plaintiffs' accounts and the Diversifier I, or, in the alternative, based on the defendants' alleged destruction of that data.

District courts have "broad discretion" in determining whether to grant an adverse inference.  See, e.g., Glover v. Costco Wholesale Corp., 153 F. App'x 774, 776 (2d Cir. 2005) (summary order).  A party seeking an adverse inference "must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find

that it would support that claim or defense." Residential
Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir.
2002).

An adverse inference would not be warranted here even if
the plaintiffs had properly sought one.[1]  In this case, the
plaintiffs have sought "metadata" which the defendants have
asserted cannot be produced in its raw form.  Magistrate Judge
Katz previously denied the plaintiffs' request for an audit of
Penn Mutual's computer systems, Memorandum Endorsement, Valenti
v. Penn Mutual, No. 10 Civ. 3325, ECF No. 41, and discussed the
issue of the metadata with the parties at multiple discovery
conferences.  See, e.g., Transcript of Conference held on

---

[1] With regard to this and other discovery disputes raised by the
plaintiffs in response to the current motion for summary
judgment, the plaintiffs may not defeat a motion for summary
judgment by arguing that the defendants acted improperly during
discovery because the plaintiffs have failed to make any motions
to compel the discovery they sought and failed to obtain any
sanctions rulings in the course of discovery.  See Bank of
America Nat'l Trust & Savings Ass'n v. Envases Venezolanos,
S.A., 740 F. Supp. 260, 269 (S.D.N.Y.) ("Simple allegations of
improper discovery tactics are not sufficient to defeat a
summary judgment motion, particularly where the party making
those allegations has failed to take advantage of the
appropriate avenues of relief available under the Federal Rules
of Civil Procedure."), aff'd sub nom, First Nat. Bank Md. v.
Envases Venezolanos, 923 F.2d 843 (2d Cir. 1990) (table).;
accord Dubied Mach. Co. v. Vermont Knitting Co., No. 85 Civ.
8610, 1992 WL 142044, at *5 (S.D.N.Y. June 11, 1992) ("This
Court has stressed that these mechanisms must be used: a party
cannot defeat a summary judgment motion by belatedly asserting
that discovery efforts have been frustrated and by vaguely
asserting that further discovery may yield unspecified facts
that could plausibly defeat summary judgment.").

October 13, 2010 ("Oct. 13 Conf. Tr."), <u>Valenti v. Penn Mutual</u>,
No. 10 Civ. 3325, ECF No. 53; (<u>see also</u> Rosell Decl. Ex. 27
(Transcript of Conference held on November 1, 2010)).)  There is
no order from either Judge Katz or this Court the violation of
which might support an adverse inference.  After lengthy
discussion of this issue before Magistrate Judge Katz, there are
no pending discovery motions in this case seeking this metadata.[2]
The defendants were simply not under any obligation to produce
this metadata.[3]

---

[2] Shortly after oral argument on this motion, the plaintiffs did
send a letter to Magistrate Judge Katz requesting that Judge
Katz grant an adverse inference in this case.  The plaintiffs
noted in the letter that while they had not filed a motion for
an adverse inference, they had written a letter to Judge Katz
over one year ago, in January, 2011, relating to the deposition
of an information technology specialist who was familiar with
Penn Mutual's computer systems.  The January, 2011 letter
requested that Judge Katz either impose an adverse inference
sanction, or set a date certain for the deposition.  There is
nothing in the record indicating that any order was issued with
respect to this letter, and the defendants argued that they did
not respond to it because it rehashed discussions that had
already been resolved.  As explained above, even if this letter
constituted a proper request for an adverse inference, an
adverse inference would not be appropriate in this case.

[3] The plaintiffs also argue that the defendants failed to
preserve properly the metadata in question because they did not
keep it in a "non-rewriteable and non-erasable" electronic
format in violation of S.E.C. regulations.  However, those
regulations allow backup records to be stored on either
"electronic storage media" that "[p]reserve[s] the records
exclusively in a non-rewriteable, non-erasable format," 17
C.F.R. § 240.17a-4(f)(2)(ii)(A), or on "micrographic media" such
as microfiche, <u>id.</u> at (f)(1)(i).  The plaintiffs have not
explained how Penn Mutual has failed to comply with this
regulation, and the evidence in the record supports the

Moreover, there is no evidence to establish that the
defendants failed to produce any documents or data with a
culpable state of mind, or to indicate that the defendants were
not acting in good faith in those discovery conferences.
Indeed, the transcripts from the discovery conferences indicate
that the defendants agreed to run additional queries of the raw
data in their computer systems in order to satisfy the
plaintiffs.  See Oct. 13 Conf. Tr. at 15-18; (see also Mellen
Repl. Decl. ¶¶ 9-21.)  Moreover, the plaintiffs have not
explained what the metadata they seek will show that is
different from the documents that have already been produced,
and that were, according to Penn Mutual, generated directly from
the raw data being sought.  (See Mellen Repl. Decl. Ex. C
(letter to plaintiffs dated Sept. 24, 2010 explaining that "the
information in question is contained in the form of raw data");
Mellen Repl. Decl. Ex. D (email to plaintiffs dated Oct. 1, 2010
explaining that "there is not an individual electronic file

---

defendants' assertion that Penn Mutual kept contemporaneous hard
copies of the annual statements from the Diversifier I.  (See
Oct. 13 Conf. Tr. at 4-5 (noting the storage of required
documents on microfiche); Locker Aff.  ¶4.)  In any event, even
if Penn Mutual has not complied with those regulations, that
non-compliance is not evidence of embezzlement, particularly
where, as here contemporaneous records of the accounts show no
embezzlement.  Moreover, noncompliance with a regulatory duty to
preserve records does not justify an adverse inference in the
absence of the other requirements for an adverse inference,
culpability and relevance.  See Byrnie v. Town of Cromwell, Bd.
of Educ., 243 F.3d 93, 109 (2d Cir. 2001).

15

corresponding to the [Plan] or to each withdrawal from [it] which occurred over the years; rather, there is an undifferentiated mass of 1's and 0's.  Periodically, a process is run on those 1's and 0's to translate them into individual statements and confirmations, like the ones your clients received over the years and we produced in discovery.").

Aside from the issue of the metadata, the plaintiffs have not offered any evidence of the existence of other documents that were requested and not produced, or that were destroyed. Where a plaintiff cannot offer any evidence to indicate that a document ever existed, the plaintiff is not entitled to an adverse interest based on the nonproduction of the document. See, e.g., Farella v. City of New York, Nos. 05 Civ. 5711, 05 Civ. 8264, 2007 WL 193867, at *2-*3 (S.D.N.Y. Jan. 25, 2007).

Moreover, an adverse interest alone would not preclude granting summary judgment to the defendants in this case.  The Court of Appeals for the Second Circuit has explained that "[i]n borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001) (internal quotation marks and citations omitted). Even if an adverse inference were warranted in this case with regard to the raw data in Penn Mutual's computer systems, which

16

it is not, an adverse inference standing alone may not defeat a
motion for summary judgment in the absence of some other, "not
insubstantial" evidence of a triable issue of fact.  Id.  No
such evidence is in the discovery record in this case.

### 2.

     The plaintiffs contend that there existed a "secret side
account," and that payments to the plaintiffs were made from the
secret side account, rather than the Diversifier I, while
disbursements from the Diversifier I were embezzled.  (See Pl.'s
R. 56.1 Resp. ¶¶ 34-38.)  However, the plaintiffs have offered
no evidence that establishes the existence of a secret side
account.  The plaintiffs point to a number on a check that was
received from Penn Mutual that is different from the number on
other Penn Mutual checks, and argue that the number signifies a
bank account number, and assert that "maybe" this bank account
is the secret side account.  (Oral Arg Tr. at 23 ; see Rosell
Decl. Ex. 46 at 15 (the "736 Check").)  The defendants
represented at oral argument that the specific number that the
plaintiffs refer to on the checks is not even a bank account
number, but simply an "internal accounting code."  (Oral Arg.
Tr. at 7.)  A number on a check, without more, is insufficient
to establish the existence of a secret side account, let alone
that such an account was used as part of a scheme to embezzle

17

from the Plan.  The plaintiffs' additional argument, that the lack of disbursements from an account number 736 as reflected in reports run by Penn Mutual is evidence that disbursements were made from a secret side account and not from the Diversifier I, must fail because, among other reasons, there is no evidence in the record that the 736 number even refers to a bank account.

The plaintiffs also argue that Penn Mutual's investment strategy for the Diversifier I made no sense, because Penn Mutual made riskier investments when the market was doing poorly, and more conservative investments when the market was doing well.  The plaintiffs argue that a jury could find that Penn Mutual's investment strategy does not make sense "unless it was fabricating the transfers to conceal its embezzlement of the funds' investment earnings." (Pl.'s R. 56.1 Resp. ¶ 23.)  Even if the plaintiffs were correct that Penn Mutual's investment strategy was a bad one, that fact does not create a triable issue as to whether the strategy was fabricated in order to conceal embezzlement.

In short, the plaintiffs have conceded that the documents in the discovery record indicate that no money is unaccounted for in their accounts, and they have failed to produce any evidence that the documents in the discovery record have been fabricated.  They speculate about the existence of a secret account but have produced not a scintilla of evidence to support

18

the existence of such an account.  Courts in this Circuit "do
not permit an issue to go to trial on the basis of mere
speculation in favor of the party that bears the burden of
proof."  Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d
134, 144 (2d Cir. 1999).  The plaintiffs have failed to meet
their burden by producing evidence of embezzlement in this case.

A RICO conspiracy claim will not lie when a plaintiff
cannot establish the predicate act.  See, e.g., Red Ball, 908 F.
Supp. at 1240-41.  Because there is no evidence in the summary
judgment record from which a reasonable jury could find that the
defendants embezzled from the Plan, the defendants' motion for
summary judgment on the plaintiffs' RICO claim must be **granted**.


## CONCLUSION

The Court has considered all of the arguments raised by the
parties. To the extent not specifically addressed, the arguments
are either moot or without merit.

The defendants' motion for summary judgment is **granted.**

**The Clerk is directed to enter judgment, to close this case
and to close all pending motions.**

SO ORDERED.

Dated:     New York, New York
           March 28, 2012

                                    John G. Koeltl
                               United States District Judge


19